1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   SIMON MUNOZ, et al.,                    No.  1:23-cv-00979-DAD-AC

12             Plaintiffs,

13        v.                                 ORDER GRANTING PLAINTIFFS' MOTION
                                             FOR PRELIMINARY APPROVAL OF
14   RDO EQUIPMENT CO.,                      CLASS ACTION SETTLEMENT

15             Defendant.                    (Doc. No. 39)

16

17

18        This matter is before the court on plaintiffs' motion for preliminary approval of class

19   action settlement of plaintiffs' wage and hour class action lawsuit against defendant RDO

20   Equipment Co.  (Doc. No. 39.)  On January 22, 2025, plaintiffs' motion was taken under

21   submission on the papers pursuant to Local Rule 230(g).  (Doc. No. 44.)  For the reasons

22   explained below, the court will grant plaintiffs' motion.

23                              **BACKGROUND**

24        Defendant is a construction, agricultural, landscape, utility, recycling, and forestry

25   equipment supplier.  (Doc. No. 41 at ¶ 2.)  Plaintiffs Simon Munoz and Giancarlo Blanco worked

26   for defendant as hourly-paid, non-exempt warehouse employees from approximately July 6, 2021

27   until on or about January 31, 2023.  (*Id*. at ¶¶ 23, 24, 60.)

28   /////

                                         1

As summarized in the pending motion, on February 16, 2023, plaintiff Munoz initially filed his class action complaint in Stanislaus County Superior Court, asserting several wage and hour causes of action, including violations of California's Unfair Competition Law and provisions of the California Labor Code.  (Doc. No. 39 at 8.)  Defendant filed a notice of removal in this court on June 29, 2023 on the basis of the Class Action Fairness Act of 2005 ("CAFA") (28 U.S.C. §§ 1332(d), 1453) because plaintiff Munoz and defendant are citizens of different states and the amount in controversy in this action exceeds $5,000,000.  (Doc. No. 1 at 2–12.)  On December 19, 2024, as part of this settlement, plaintiff Munoz filed a second amended complaint ("SAC"), adding a claim under the California Labor Code's Private Attorney Generals Act of 2004 ("PAGA") (Cal. Lab. Code §§ 2698–2699.8), and adding plaintiff Blanco as a named plaintiff.  (Doc. No. 41.)  Plaintiff Blanco had filed a class action complaint against defendant in the Riverside County Superior Court on February 21, 2023.  (Doc. No. 39 at 8.)

Thereafter, the parties "conducted significant investigation and discovery of the facts and law" and defendant "produced over a thousand pages of documents," including policy documents, handbooks, wage and hour policies, meal and rest period policies, Excel files including employee hire and termination dates, employee time and pay records, and data regarding employee and workweek numbers.  (Doc. No. 39 at 9.)  Plaintiffs then "had an expert review and analyze the sampling of time and pay records."  (*Id*.)  Following two mediation sessions with wage and hour mediator David Rotman on July 9, 2024, and September 11, 2024, the parties agreed to settle the action.  (*Id*.)  On December 17, 2024, plaintiffs filed a motion for preliminary approval of the class and PAGA action settlement.  (Doc. No. 39.)  The parties attached thereto their executed long-form Joint Stipulation and Settlement Agreement (the "Settlement Agreement").  (Doc. No. 39-1 at 17–56.)  In their pending motion plaintiffs seek an order from this court:  (1) provisionally certifying the settlement class, for settlement purposes only, with appointment of plaintiffs as class representatives, appointment of plaintiffs' counsel as class counsel, and approval of Phoenix Class Action Administration Solutions ("Phoenix") as the Settlement Administrator; (2) preliminarily approving the parties' proposed settlement; (3) approving and directing the /////

mailing of the proposed Class Notice; and (4) scheduling the hearing date for the final approval of

the class settlement.  (Doc. No. 39 at 2–4.)

## THE PROPOSED SETTLEMENT

**A.      The Class**

For settlement purposes, the parties request approval of the following class (the "Class")

of an estimated 643 individuals (the "Class Members" or "Settlement Class"):  "all current and

former non-exempt, hourly employees who were employed by RDO in California at any time

from April 25, 2019, through November 11, 2024."  (Doc. No. 39 at 9.)

**B.      Aggrieved Employees Under the PAGA**

The parties have defined "Aggrieved Employees" in the Settlement Agreement as "all

current and former nonexempt, hourly employees who were employed by RDO in California at

any time from February 22, 2022, through November 11, 2024."  (*Id*. at 13.)  Twenty-five percent

of the civil PAGA penalties will be paid to the Aggrieved Employees as part of their PAGA

payment shares, as described below.  (*Id.*)

**C.      Class Period**

As stated in the parties' Settlement Agreement, the Class period is "April 25, 2019,

through November 11, 2024."  (Doc. No. 39-1 at 19.)  Further, the parties have defined the PAGA

period as extending from February 22, 2022 to November 11, 2024.  (*Id*. at 22.)

**D.      The Release of Claims**

The Settlement Agreement defines the released parties as "Defendant RDO Equipment

Co. and its past or present officers, directors, employees and agents which could be jointly liable

with Defendant for the claims alleged."  (*Id*. at 23.)  The "Released Claims" are defined as:

> any and all claims that were pled or could have been pled based off
> of the facts contained in the Operative Complaint.   These are:
> (a) failure to pay all straight time wages; (b) failure to pay all
> overtime wages; (c) failure to provide meal periods; (d) failure to
> authorize and permit rest periods; (e) failure to adopt a compliant
> sick pay/paid time off policy; (f) knowing and intentional failure to
> comply  with  itemized  employee  wage  statement  provisions;
> (g) failure to  pay  all  wages  due  at  the  time  of  termination  of
> employment;  (h)  failure  to  reimburse/illegal  deductions;  and
> (i) violation of Unfair Competition Law.  The release shall be for the
> Class Period.

1   (*Id*. at 22–23.)  In addition, the Settlement Agreement provides for the release of PAGA claims

2   ("Released PAGA Claims"), which are defined as "any and all claims that were alleged or could

3   have been alleged based on the claims, facts, and/or allegations contained in [the] Operative

4   Complaint and in the PAGA Notices submitted by Plaintiffs to the [California Labor and

5   Workforce Development Agency ("LWDA")]."  (*Id*. at 23.)  The Settlement Agreement does not

6   explicitly state that all Aggrieved Employees are subject to the release of the Released PAGA

7   Claims, regardless of whether or not they opt out of the Class.

8   **E.      Summary of the Settlement Terms**

9           Under the parties' Settlement Agreement, defendant will pay a gross settlement amount

10  ("GSA") of $2,000,000.00 allocated as follows:  (1) up to $666,600 for attorneys' fees and up to

11  $50,000 for plaintiffs' counsel's documented litigation costs; (2) $10,000 incentive awards for

12  each named plaintiff; (3) $100,000 in civil PAGA penalties, with $75,000 of the penalties payable

13  to the LWDA; and (4) up to $15,000 for settlement administration costs.  (Doc. No. 39 at 10–13.)

14  Defendant's employer payroll taxes will be paid by defendant separate and apart from the GSA.

15  (*Id*. at 10.)  The GSA funds are non-reversionary, meaning no portion will revert to defendant for

16  any reason.  (*Id.*)

17          Assuming these allocations are awarded in full, approximately $1,148,400.00 in a net

18  settlement amount will be available for distribution to Class Members who do not submit a timely

19  and valid request to be excluded from the settlement.  (*Id*. at 14.)  The settlement is projected to

20  pay each Class Member an average of $1,786.00, less employee taxes.  (*Id*. at 7.)  After the funds

21  are distributed to the Class Members, the Class Members will have 180 days to cash their checks.

22  (*Id.* at 15.)  Any remaining amounts from uncashed checks will be sent to the California

23  Controller's Unclaimed Property Fund in the name of the Class Member, thereby leaving no

24  "unpaid residue."  (*Id.*)

25                                  **LEGAL STANDARDS**

26  **A.      Rule 23 Settlements**

27          Class actions require the approval of the district court before settlement.  Fed. R. Civ. P.

28  23(e) ("The claims, issues, or defenses of a certified class—or a class proposed to be certified for

purposes of settlement—may be settled, voluntarily dismissed, or compromised only with the court's approval."). "Approval under 23(e) involves a two-step process in which the Court first determines whether a proposed class action settlement deserves preliminary approval and then, after notice is given to class members, whether final approval is warranted." *Haro v. Walmart, Inc.*, No. 1:21-cv-00239-NODJ-SKO, 2024 WL 1160492, at *4 (E.D. Cal. Mar. 18, 2024) (citing *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 525 (C.D. Cal. 2004)).

The first step in the two-step process is preliminary approval. During preliminary approval, the court conducts a preliminary fairness evaluation to determine if notice of the class action settlement should issue to class members and, if applicable, whether the proposed settlement class should be certified. *See* David F. Herr, *Ann. Manual Complex Lit.* § 21.632 (4th ed.). Under Rule 23(e)(1), the court must direct notice to all class members who would be bound by the settlement proposal if the parties show that "the court will likely be able to:" (i) approve the proposal under Rule 23(e)(2)'s fair, reasonable, and adequate standard; and (ii) certify the proposed settlement class. Fed. R. Civ. P. 23(e)(1); *see also Lounibos v. Keypoint Gov't Sols. Inc.*, No. 12-cv-00636-JST, 2014 WL 558675, at *5 (N.D. Cal. Feb. 10, 2014) (quoting *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1079 (N.D. Cal. 2007)) (noting that federal courts generally grant preliminary approval if "the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and falls within the range of possible approval").

The second step of the process is the final approval. During final approval, "[i]f the proposal would bind class members, the court may approve it only after a hearing and only on finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). In doing so, the court must consider several factors, including whether: "the class representatives and class counsel have adequately represented the class"; "the proposal was negotiated at arm's length"; "the proposal treats class members equitably relative to each other"; and "the relief provided for the class is adequate." *Id.* When considering whether "the relief provided for the class is adequate," the court should also take into account the following:

(i) the costs, risks, and delay of trial and appeal;

(ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

(iii) the terms of any proposed award of attorney's fees, including timing of payment; and

(iv) any agreement required to be identified under Rule 23(e)(3).

*Id.* In addition to the two-step review process, Rule 23(e) also requires that: (i) the parties seeking approval file a statement identifying the settlement agreement; (ii) class members be given an opportunity to object; and (iii) no payment be made in connection with forgoing or withdrawing an objection, or forgoing, dismissing, or abandoning an appeal. Fed. R. Civ. P. 23(e)(3), (5).

"Courts have long recognized that settlement class actions present unique due process concerns for absent class members." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011) (internal quotation marks and citations omitted). To protect the rights of absent class members, Rule 23(e) requires that the court approve such settlements "only after a fairness hearing and a determination that the settlement is fair, reasonable, and adequate." *Id.* When approval is sought of a settlement negotiated before formal class certification, "there is an even greater potential for a breach of fiduciary duty owed the class during settlement." *Id.* In such circumstances, the "settlement approval requires a higher standard of fairness" and a "more exacting review" so as "to ensure that class representatives and their counsel do not secure a disproportionate benefit at the expense of the unnamed plaintiffs who class counsel had a duty to represent." *Lane v. Facebook, Inc.*, 696 F.3d 811, 819 (9th Cir. 2012) (internal quotation marks and citations omitted). Rule 23 also "demand[s] undiluted, even heightened, attention" to the certification requirements when class certification is sought only for purposes of settlement. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997). Accordingly, the district court must examine the propriety of certification under Rule 23 both at this preliminary stage and at a later fairness hearing. *See, e.g.*, *Ogbuehi v. Comcast*, 303 F.R.D. 337, 344 (E.D. Cal. Oct. 2, 2014).

/////

/////

**B.    PAGA Settlements**

Under PAGA, an "aggrieved employee" may bring an action for civil penalties for labor code violations on behalf of himself and other current or former employees.  Cal. Lab. Code § 2699(a).[1]  A plaintiff suing under PAGA "does so as the proxy or agent of the state's labor law enforcement agencies." *Arias v. Superior Court*, 46 Cal. 4th 969, 986 (2009).  Thus, a judgment in a PAGA action "binds all those, including nonparty aggrieved employees, who would be bound by a judgment in an action brought by the government." *Id.*

The PAGA statute imposes several limits on litigants.  First, because a PAGA action functions as a "substitute" for an action brought by the state government, a plaintiff suing under PAGA is limited to recovery of civil penalties only, rather than damages or unpaid wages available privately through direct or class action claims. *Iskanian v. CLS Transp. Los Angeles, LLC*, 59 Cal. 4th 348, 381 (2014), *overruled on other grounds by Quach v. Cal. Com. Club, Inc*., 16 Cal. 5th 562 (2024), *and abrogated on other grounds by Viking River Cruises, Inc. v. Moriana*, 596 U.S. 639 (2022); *ZB, N.A. v. Superior Court*, 8 Cal. 5th 175, 182, 193 (2019), *rev'd in part on other grounds by Viking River Cruises, Inc.*, 596 U.S. 639.  Second, to bring an action under PAGA, an aggrieved employee must first provide written notice to the LWDA as well as to the employer.  Cal. Lab. Code § 2699.3(a)(1).  Third, any civil penalties recovered must be divided between the LWDA and the aggrieved employees.  *See* Cal. Lab. Code § 2699(i) (2016) (requiring a 75%-25% apportionment); *id.* § 2699(m), (v)(1) (2024) (noting that the 2024 amendments, including the new 65%-35% apportionment requirement, apply only to "civil

/////

/////

/////

/////

/////

---

[1]  An "aggrieved employee" is defined as "any person who was employed by the alleged violator against whom one or more of the alleged violations was committed . . . ."  Cal. Lab. Code § 2699(c)(1).

action[s] brought on or after June 19, 2024").[2]  Fourth, and finally, the proposed settlement must

be submitted to the LWDA, and a trial court must "review and approve" any settlement of PAGA

claims.  *Id.* § 2699(s)(2); *see also Haralson v. U.S. Aviation Servs. Corp.*, 383 F. Supp. 3d 959,

971 (N.D. Cal. 2019) (citation omitted) (noting that because settling a PAGA claim

"compromises a claim that could otherwise be brought be the state," it requires that a court

"review and approve any settlement of any civil action pursuant to [PAGA]").

Although there is no binding authority setting forth the appropriate standard of review to

be employed for PAGA settlements, California district courts "have applied a Rule 23-like

standard, asking whether the settlement of the PAGA claims is 'fundamentally fair, adequate, and

reasonable in light of PAGA's policies and purposes.'"  *Haralson*, 383 F. Supp. 3d at 972

(quoting *Jordan v. NCI Grp., Inc.*, No. 16-cv-01701-JVS-SP, 2018 WL 1409590, at *2 (C.D. Cal.

Jan. 5, 2018)).  This standard is derived principally from the LWDA itself.  In commenting on a

proposed settlement including both class action and PAGA claims, the LWDA has offered the

following guidance:

> It is thus important that when a PAGA claim is settled, the relief
> provided for under the PAGA be genuine and meaningful, consistent
> with the underlying purpose of the statute to benefit the public and,
> in the context of a class action, the court evaluate whether the
> settlement meets the standards of being "fundamentally fair,
> reasonable, and adequate" with reference to the public policies
> underlying the PAGA.

*O'Connor v. Uber Techs., Inc.*, 201 F. Supp. 3d 1110, 1133 (N.D. Cal. 2016) (citing the LWDA's

guidance with approval).[3]  Recognizing the distinct issues presented by class actions, this court is

---

[2]  Plaintiff Munoz initiated this action and provided notice to the LWDA in accordance with the PAGA on February 16, 2023.  (Doc. No. 39 at 8.)  Accordingly, the court agrees with the parties that the 75%-25% apportionment of civil penalties between the LWDA and the Aggrieved Employees applies here, since the 2024 amendments do not apply retroactively.  *Cf. Mendoza v. Movement Mortg., LLC*, No. 2:24-cv-03479-DAD-CSK, 2025 WL 1646897, at *4 n.4 (E.D. Cal. June 11, 2025) ("For PAGA actions brought prior to June 19, 2024, plaintiffs received 25% of the penalties and the LWDA received 75%. . . . Because this action was commenced after June 19, 2024, the 35% apportionment applies.").

[3]  The LWDA has also stated that it "is not aware of any existing case law establishing a specific benchmark for PAGA settlements, either on their own terms or in relation to the recovery on other claims in the action."  *O'Connor v. Uber Techs., Inc.*, No. 3:13-cv-03826-EMC, Doc. No. 736 at 2–3 (N.D. Cal. July 29, 2016).

persuaded by the LWDA's reasoning cited by the district court in *O'Connor* and therefore adopts its proposed standard in evaluating the PAGA portion of the settlement now before the court. *See, e.g.*, *Castro v. Paragon Indus., Inc.*, No. 1:19-cv-00755-DAD-SKO, 2020 WL 1984240, at *6 (E.D. Cal. Apr. 27, 2020); *see also Bell v. Home Depot U.S.A., Inc.*, No. 2:12-cv-02499-DJC-CKD, 2025 WL 1557142, at *5 n.3 (E.D. Cal. June 2, 2025).  Accordingly, the court will approve a settlement of PAGA claims upon a showing that the settlement terms:  (1) meet the statutory requirements set forth by PAGA; and (2) are fundamentally fair, reasonable, and adequate in view of PAGA's public policy goals.

When a proposed settlement involves overlapping class action and PAGA claims, courts may employ a "sliding scale" in determining if the proposed settlement is "fundamentally fair, reasonable, and adequate with reference to the public policies underlying the PAGA."  *O'Connor*, 201 F. Supp. 3d at 1134; *see also Haralson*, 383 F. Supp. 3d at 972 (following *O'Connor*); *McClure v. Brand Energy Serv., LLC*, No. 2:18-cv-01726-KJM-AC, 2021 WL 2168149, at *10 (E.D. Cal. May 27, 2021) (same); *Cooks v. TNG GP*, No. 2:16-cv-01160-KJM-AC, 2020 WL 5535397, at *9–10 (E.D. Cal. Sept. 15, 2020) (same).  As the district court in *O'Connor* explained:

> For example, if the settlement for the Rule 23 class is robust, the purposes of PAGA may be concurrently fulfilled.  By providing fair compensation to the class members as employees and substantial monetary relief, a settlement not only vindicates the rights of the class members as employees, but may have a deterrent effect upon the defendant employer and other employers, an objective of PAGA.  Likewise, if the settlement resolves the important question of the status of workers as employees entitled to the protection of the Labor Code or contained substantial injunctive relief, this would support PAGA's interest in "augmenting the state's enforcement capabilities, encouraging compliance with Labor Code provisions, and deterring noncompliance."

*Id.* at 1134–35 (quoting the LWDA's guidance).  At the same time, where "the compensation to the class amount[] is relatively modest when compared to the verdict value, the non-monetary relief is of limited benefit to the class, and the settlement does nothing to clarify [aggrieved workers' rights and obligations], the settlement of the non-PAGA claims does not substantially vindicate PAGA."  *Id.* at 1135.  Finally, "where plaintiffs bring a PAGA representative claim,

they take on a special responsibility to their fellow aggrieved workers who are effectively bound by any judgment." *Id.* at 1134. Plaintiffs' special responsibility to other Aggrieved Employees is especially significant because "PAGA does not require class action procedures, such as notice and opt-out rights." *Id.* Thus,

> [t]he Court must be cognizant of the risk that despite this responsibility, there may be a temptation to include a PAGA claim in a lawsuit to be used merely as a bargaining chip, wherein the rights of individuals who may not even be members of the class and the public may be waived for little additional consideration in order to induce the employer to agree to a settlement with the class.

*Id.*

# ANALYSIS

## A.    Preliminary Class Certification

The class action is a procedural mechanism whereby the "usual rule that litigation be conducted by and on behalf of the named parties only" is swept aside so that multiple parties—unwieldy in number but possessing similar or identical claims—may pursue common redress in an efficient and economical manner. *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (citation omitted). Here, the parties seek preliminary certification of the proposed class under Federal Rule of Civil Procedure 23, which governs class certification and imposes a two-step process in deciding whether a class may be certified.

First, Rule 23(a) requires the moving party to demonstrate the existence of four prerequisites: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy. *See Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 730 (9th Cir. 2007). Second, when a putative class satisfies these four prerequisites, it may then proceed to show it also satisfies at least one of the provisions of Rule 23(b). *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998), *overruled on other grounds by Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011). The party seeking class certification bears the burden of establishing conformity with this two-step process and must do so by producing facts that "affirmatively demonstrate" that class certification is warranted. *Comcast*, 569 U.S. at 33. Only after conducting a "rigorous analysis" of the produced facts and determining that they show compliance with Rule 23(a) and (b), may a district court

1    certify a class. *Id.* at 33–34; *see also Patel v. Nike Retail Servs., Inc.*, No. 14-cv-04781-RS, 2016

2    WL 1241777, at *3 (N.D. Cal. Mar. 29, 2016) ("This 'rigorous' analysis applies both to Rule

3    23(a) and Rule 23(b).").

4        Accordingly, the court will first address the Rule 23(a) requirements followed by the

5    requirements for a Rule 23(b)(3) certification, which plaintiffs contend applies here. (Doc. No.

6    44-1 at 23.)

7        1.    Rule 23(a) Requirements

8            a.    *Numerosity*

9        The first Rule 23(a) requirement is that "the class is so numerous that joinder of all

10    members is impracticable." Fed. R. Civ. P. 23(a)(1). The numerosity requirement demands

11    "examination of the specific facts of each case and imposes no absolute limitations." *Gen. Tel.*

12    *Co. of Nw., Inc. v. EEOC*, 446 U.S. 318, 330 (1980). Courts have found the requirement satisfied

13    when the class comprises as few as thirty-nine members or where joining all class members

14    would serve only to impose financial burdens and clog the court's docket. *See Murillo v. Pac.*

15    *Gas & Elec. Co.*, 266 F.R.D. 468, 474 (E.D. Cal. 2010) (citation omitted) (discussing Ninth

16    Circuit thresholds for numerosity and listing cases).

17        Here, plaintiffs estimate that there are approximately 643 members in the Settlement

18    Class. (Doc. No. 39 at 9.) This showing with respect to numerosity is adequate to meet the

19    requirements of Rule 23(a)(1). *See Arredondo v. Sw. & Pac. Specialty Fin., Inc.*, No. 1:18-cv-

20    01737-DAD-SKO, 2022 WL 396575, at *8 (E.D. Cal. Feb. 9, 2022) (finding the plaintiff's

21    estimation of 690 members in the proposed settlement class to be an adequate showing with

22    respect to numerosity).

23            b.    *Commonality*

24        The second Rule 23(a) requirement is that "there are questions of law or fact common to

25    the class." Fed. R. Civ. P. 23(a)(2). To satisfy the commonality requirement, the class

26    representatives must demonstrate that common questions of fact and law will drive or resolve the

27    litigation. *See Wal-Mart Stores, Inc.*, 564 U.S. at 350. "[C]ommonality requires that the class

28    members' claims depend upon a common contention such that determination of its truth or falsity

11

will resolve an issue that is central to the validity of each claim in one stroke." *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012) (internal quotations omitted) (quoting *Wal-Mart*, 564 U.S. at 350). "The plaintiff must demonstrate the capacity of classwide proceedings to generate common answers to common questions of law or fact that are apt to drive the resolution of the litigation." *Id.* For example, "[c]ommonality is generally satisfied where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members." *Benitez v. W. Milling, LLC*, No. 1:18-cv-01484-SKO, 2020 WL 309200, at *5 (E.D. Cal. Jan. 21, 2020) (internal quotation marks and citations omitted).

The commonality requirement does not mandate that all questions of law or fact be common to every single class member and "dissimilarities among class members do not [necessarily] impede the generation of common answers to those questions . . . ." *Parsons v. Ryan*, 754 F.3d 657, 675 (9th Cir. 2014); *but see Wal-Mart*, 564 U.S. at 349 (citation omitted) (noting that "[d]issimilarities within the proposed class . . . have the *potential* to impede the generation of common answers") (emphasis added). However, merely raising any common question does not suffice. *See Wal-Mart*, 564 U.S. at 349 (noting the language of Rule 23(a)(2) is "easy to misread" because "[a]ny competently crafted class complaint literally raises common 'questions'") (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 131–32 (2009)). Instead, the common question must depend upon a common contention; that common contention must be answerable through a classwide proceeding; and that common answer should have the potential to drive the litigation towards resolution. *See id.* at 349–50.

Here, plaintiffs contend in their SAC that "[t]here are questions of law and fact common to the Class that predominate over any questions affecting only individual Class Members." (Doc. No. 41 at ¶ 37.) The SAC then lists thirteen common questions of law and fact. (*Id.*) In plaintiffs' pending motion, they have summarized the common issues of fact and law as "whether Defendant's uniform policies deprived the Class of compliant meal and rest periods, accurate wage statements, and all overtime wages." (Doc. No. 39 at 16.)

/////

Because the above issues "would form the basis of each [] plaintiff's claims," the court finds that commonality is satisfied here. *Bykov v. DC Transp. Servs.*, Inc., No. 2:18-cv-01691-DB, 2019 WL 1430984, at *3 (E.D. Cal. Mar. 29, 2019) (citation omitted); *see also Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1165–66 (9th Cir. 2014) (finding that the commonality requirement was satisfied when class action claims against an employer included the common question of whether the employer had a practice or unofficial policy of requiring putative class members to work unpaid off-the-clock overtime).

> c.    *Typicality*

The third Rule 23(a) requirement is satisfied if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "The typicality requirement looks to whether the claims of the class representatives are typical of those of the class and is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010) (citations and internal quotation marks omitted). The typicality requirement is a permissive standard: "[class] representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon*, 150 F.3d at 1020. Courts evaluate typicality by considering "whether other [class] members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (citations omitted) ("[C]lass certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation.").

Here, plaintiffs state that their claims and "those of the putative class members are based on the same alleged course of conduct, i.e., the claim that Defendants do not provide compliant meal and rest periods and pay all wages owed to putative class members," and accordingly they have suffered a "similar injury, i.e., the non-payment of premiums for allegedly non-compliant

/////

13

1    meal and rest periods and overtime wages due to Defendants allegedly not calculating putative

2    class members' proper overtime compensation." (Doc. No. 39 at 17.)

3         Because the proposed class consists of employees who, like plaintiff, were employed by

4    defendant in California and were allegedly subjected to the same wage and hour violations and

5    uniform practices detailed above, the court finds that the claims brought by plaintiffs are

6    "reasonably co-extensive with those of absent class members." *Hanlon*, 150 F.3d at 1020. Thus,

7    the typicality requirement is satisfied here.

8                    d.    *Adequacy of Representation*

9         The final Rule 23(a) prerequisite is satisfied if "the representative parties will fairly and

10   adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Resolution of this issue

11   requires the court to address the following questions: "(a) do the named plaintiffs and their

12   counsel have any conflicts of interest with other class members and (b) will the named plaintiffs

13   and their counsel prosecute the action vigorously on behalf of the class?" *Sali v. Corona Reg'l*

14   *Med. Ctr.*, 909 F.3d 996, 1007 (9th Cir. 2018); *see also Pierce v. County of Orange*, 526 F.3d

15   1190, 1202 (9th Cir. 2008). "Adequacy of representation also depends on the qualifications of

16   counsel." *Sali*, 909 F.3d at 1007 (citation omitted).

17        Plaintiffs contend that the adequacy of representation requirement is met here because

18   "[t]here is no evidence of antagonism between the Class Representatives' interests and those of

19   the Class," there is "no evidence of any collusion between the Parties," and "[t]he Class

20   Representatives have litigated this case in good faith and the interests of the Class

21   Representatives are aligned with those of the Class as they all share a common interest in

22   challenging the legality of the alleged policies and procedures on which the claims are based."

23   (Doc. No. 39 at 17.) Based on these assertions and the above description of plaintiffs' claims, the

24   court is satisfied that plaintiffs interests align with those of the proposed Class Members and that

25   plaintiffs would vigorously prosecute the action on behalf of the class.

26        Plaintiffs' counsel has also submitted declarations to establish their adequacy as Class

27   counsel. (Doc. Nos. 39-1; 39-2.) According to the declaration of attorney David Mara, counsel

28   of record for plaintiffs and the putative Class, he is the president of Mara Law Firm, PC and has

been practicing law in California since 2004.  (Doc. No. 39-1 at ¶¶ 1, 2.)  Mara Law Firm, PC

devotes a significant portion of its practice specifically to wage and hour class action litigation

and is well versed in wage and hour class action law.  (*Id.* at ¶¶ 10, 11.)  Attorney Mara represents

that his law firm has been appointed class counsel in numerous federal and state class actions and

has handled over 450 class action and PAGA lawsuits, successfully settling approximately 200

cases over a period of approximately fifteen years, resulting in the recovery of millions of dollars

for class members.  (*Id.* at ¶ 10.)  In support of this assertion, attorney Mara has listed samplings

of class action cases involving wage and hour violations under California law in which he has

been involved as counsel for plaintiffs, has obtained class certification and been certified as class

counsel, and has settled.  (*Id.* at ¶¶ 9, 11, 12.)  Additionally, attorney Douglas Han represents in

his declaration that he is the attorney of record for plaintiff Blanco and the putative Class, and he

is the founding member of Justice Law Corporation.  (Doc. No. 39-2 at ¶ 1.)  Attorney Han

represents that the Justice Law Corporation firm has almost exclusively focused on the

prosecution of consumer and employment class actions, involving wage-and-hour claims, unfair

business practices, or consumer fraud and has successfully litigated to conclusion over 300 wage-

and-hour class or representative actions, resulting in millions of dollars being awarded to

thousands of individuals in California.  (*Id.* at ¶ 3.)  In support of this assertion, attorney Han has

provided a list of some of the class action and representative matters in which his firm has been

appointed to serve as class counsel and ultimately received final approval of settlements.  (*Id.* at

13.)

Because plaintiffs and their counsel represent that there are no conflicts of interest with

the Class Members, and both Mara Law Firm, PC and Justice Law Corporation appear to be

experienced in class action litigation on behalf of plaintiffs, the court finds that the adequacy of

representation requirement has been preliminarily satisfied.

2.     Rule 23(b)(3) Requirements

The parties seek class certification under Rule 23(b)(3), which requires a finding that:  (1)

the questions of law or fact common to class members predominate over any questions affecting

only individual members; and (2) a class action be superior to other available methods for fairly

1    and efficiently adjudicating the controversy.  *See Amchem*, 521 U.S. at 615; *In re Hyundai and*

2    *Kia Fuel Economy Litigation*, 926 F.3d 539, 556 (9th Cir. 2019) (*en banc*).  The test under Rule

3    23(b)(3) is "far more demanding" than that of Rule 23(a).  *Wolin v. Jaguar Land Rover N. Am.,*

4    *LLC*, 617 F.3d 1168, 1172 (9th Cir. 2010) (quoting *Amchem*, 521 U.S. at 623–24).

5                              a.    *Predominance*

6            First, common questions must "predominate" over any individual questions.  While this

7    requirement is similar to the Rule 23(a)(2) commonality requirement, the standard is higher at this

8    stage of analysis.  *Wal-Mart Stores, Inc.*, 564 U.S. at 359.  While Rule 23(a)(2) can be satisfied

9    by even a single question, Rule 23(b)(3) requires convincing proof that common questions

10   "predominate" over individual questions.  *Amchem*, 521 U.S. at 623–24.  "An individual question

11   is one where 'members of a proposed class will need to present evidence that varies from member

12   to member,' while a common question is one where 'the same evidence will suffice for each

13   member to make a *prima facie* showing [or] the issue is susceptible to generalized, class-wide

14   proof.'"  *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (quoting W. Rubenstein,

15   *Newberg on Class Actions* § 4:50, pp. 196–197 (5th ed. 2012)).  "When common questions

16   present a significant aspect of the case and can be resolved for all members of the class in a single

17   adjudication, there is clear justification for handling the dispute on a representative rather than on

18   an individual basis."  *Hanlon*, 150 F.3d at 1022.

19           As discussed above, in this action plaintiffs challenge defendant's "uniform policies" that

20   allegedly deprived Class Members of statutorily required meal and rest periods and overtime

21   compensation for hours worked.  (Doc. No. 39 at 18.)  Class actions in which a defendant's

22   uniform policies are challenged generally satisfy the predominance requirement of Rule 23(b)(3).

23   *See, e.g., Rojas-Cifuentes v. ACX Pac. Nw. Inc.*, No. 2:14-cv-00697-CKD, 2025 WL 959206, at

24   *9 (E.D. Cal. Mar. 31, 2025); *Castro*, 2020 WL 1984240, at *6; *Palacios v. Penny Newman*

25   *Grain, Inc.*, No. 1:14-cv-01804-KJM-SAB, 2015 WL 4078135, at *5–6 (E.D. Cal. July 6, 2015).

26   The court therefore concludes that the predominance requirement has been met in this case.

27   /////

28   /////

16

1           b.     *Superiority*

2           Rule 23(b)(3) also requires a court to find that "a class action is superior to other available

3    methods for the fair adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).  To resolve the

4    Rule 23(b)(3) superiority inquiry, "the court should consider class members' interests in pursuing

5    separate actions individually, any litigation already in progress involving the same controversy,

6    the desirability of concentrating in one forum, and potential difficulties in managing the class

7    action—although the last two considerations are not relevant in the settlement context." *Jones v.*

8    *Tirehub LLC*, No. 2:21-cv-00564-DB, 2024 WL 2132611, at *5 (E.D. Cal. May 13, 2024) (citing

9    *Palacios*, 2015 WL 4078135, at *6).

10           Here, plaintiffs assert that the superiority requirement is satisfied because the

11    "[c]ertification of the Class will allow Class Members' claims to be fairly, adequately, and

12    efficiently resolved to a degree that no other mechanism would provide."  (Doc. No. 39 at 9.)

13    They assert that "[a]lternative methods of resolution would be individual claims for relatively

14    small amount[s] of damages," which "would prove uneconomic for potential plaintiffs because

15    'litigation costs would dwarf potential recovery.'"  (*Id.*) (quoting *Hanlon*, 150 F. 3d at 1023).

16           Given that "[a] common nucleus of facts and potential legal remedies" predominate here,

17    the court finds that these questions can be resolved for all members more efficiently and

18    expeditiously in a single action.  *Hanlon*, 150 F.3d at 1022.  Therefore, the court is satisfied that

19    the superiority requirement has been met in this case.

20           Accordingly, for all the foregoing reasons, the requirements for preliminary certification

21    under Rule 23 have been satisfied, and the court finds that conditional certification of the Class is

22    appropriate.

23    **B.**    **Preliminary Settlement Approval**

24           Plaintiffs also seek preliminary approval of the parties' proposed settlement.  Under Rule

25    23(e), a court may approve a proposed class action settlement only if it is a fair, reasonable, and

26    adequate resolution of the dispute.  Fed. R. Civ. P. 23(e)(2); *Bluetooth*, 654 F.3d at 946.

27    Preliminary approval is appropriate when "the court will likely be able to" give final approval

28    under Rule 23(e)(2).  As such, "preliminary approval of a settlement has both a procedural and

substantive component" and is appropriate if:  (1) the proposed settlement appears to be the product of serious, informed, non-collusive negotiations; and (2) the settlement falls within the range of possible approval, has no obvious deficiencies, and does not improperly grant preferential treatment to class representatives or segments of the class.  *Tableware Antitrust Litig.*, 484 F. Supp. 2d at 1079 (citation omitted); *see also* Fed. R. Civ. P. 23(e)(1)(B).  Because the proposed settlement has a PAGA component, it must also meet the statutory requirements under that act and be fundamentally fair, reasonable, and adequate in view of PAGA's public policy goals.

### 1.    The PAGA Component

PAGA requires that a proposed settlement be submitted to the LWDA.  Cal. Lab. Code § 2699(s)(2); *see also Haralson*, 383 F. Supp. 3d at 971 (citation omitted) (noting that a proposed settlement should be submitted to the LWDA to allow it to comment if it so desires).  Here, the parties have not disclosed whether the Settlement Agreement has been submitted to the LWDA and whether the LWDA has commented on the settlement to date, although the Settlement Agreement notes that plaintiffs "shall send a copy of the Agreement to the LWDA."  (Doc. No. 39-1 at 31.)[4]  In their motion for final approval, plaintiffs are directed to specify whether and when the Settlement Agreement was submitted to the LWDA and whether the LWDA has commented on the proposed settlement.  The court will continue to address the fairness, reasonableness, and adequacy of the PAGA penalties below.

### 2.    Procedural Fairness

"The court must [next] consider whether the process by which the parties arrived at their settlement is truly the product of arm's length bargaining and not collusion or fraud."  *Haro v.*

---

[4]  The parties also have not clearly stated whether they submitted notice of the proposed settlement to the appropriate federal and state officials, as is required by the CAFA pursuant to 28 U.S.C. § 1715(b).  Under § 1715(b), each participating defendant must serve notice of the proposed settlement upon certain state and federal officials within ten days of the filing of the proposed settlement.  Plaintiffs note this requirement in their pending motion and indicate that "[i]f Defendant has not already given such notice, this notice will be given no later than ten days of this filing."  (Doc. No. 39 at 31.)  The parties are directed to inform the court in their motion for final approval whether and when they provided such notice in accordance with § 1715(b).

18

*Walmart, Inc.*, No. 1:21-cv-00239-KES-SKO, 2025 WL 73109, at *10 (E.D. Cal. Jan. 10, 2025) (citing *Millan v. Cascade Water Servs., Inc.*, 310 F.R.D. 593, 613 (E.D. Cal. 2015)). "A settlement is presumed to be fair if it 'follow[s] sufficient discovery and genuine arm[']s-length negotiation.'" *Cavazos v. Salas Concrete Inc.*, No. 1:19-cv-00062-DAD-EPG, 2022 WL 506005, at *13 (E.D. Cal. Feb. 18, 2022) (quoting *Adoma v. Univ. of Phx., Inc.*, 913 F. Supp. 2d 964, 977 (E.D. Cal. 2012)). In addition, the parties' participation in mediation "tends to support the conclusion that the settlement process was not collusive." *Palacios*, 2015 WL 4078135, at *8 (citation omitted).

Here, as indicated above, the parties attended two private mediation sessions with David Rotman, a respected wage and hour mediator, on July 9 and September 11, 2024, after over a year of litigation. (Doc. No. 39 at 9.) Prior to these mediation sessions, defendant provided plaintiffs and their counsel with "substantial discovery" including "over a thousand pages of documents," including policy documents, handbooks, wage and hour policies, meal and rest period policies, Excel files including employee hire and termination dates, employee time and pay records, and data regarding employee and workweek numbers, which plaintiffs' counsel analyzed with the assistance of an expert. (*Id.* at 9, 21.) According to their Settlement Agreement, the parties were not able to reach an agreement to settle the action until their second mediation session, after two days of "arms-length negotiations." (Doc. No. 39-1 at 24, 41.) Based on these representations, it appears that the Settlement Agreement was the result of fairly extensive negotiation between capable counsel and, accordingly, the court preliminarily concludes that the parties' negotiation constituted genuine, informed, and arm's-length bargaining.

       3.   <u>Substantive Fairness</u>

          a.   *Adequacy of the Settlement Amount*

In evaluating the fairness of a settlement award, "the settlement's benefits must be considered by comparison to what the class actually gave up by settling." *Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1123 (9th Cir. 2020) (citing *Protective Comm. For Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424–25 (1968) ("Basic to [the] process [of evaluating settlements] . . . is the need to compare the terms of the compromise with the likely

1   rewards of litigation.")).  However, "[i]t is well-settled law that a cash settlement amounting to

2   only a fraction of the potential recovery does not *per se* render the settlement inadequate or

3   unfair."  *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000), *as amended* (June

4   19, 2000) (citation omitted).  To determine whether a settlement "falls within the range of

5   possible approval," a court must focus on "substantive fairness and adequacy" and "consider

6   plaintiffs' expected recovery balanced against the value of the settlement offer."  *Tableware*

7   *Antitrust Litig.*, 484 F. Supp. 2d at 1080.

8          The parties in this case have agreed to a $2,000,000.00 GSA.  (Doc. No. 39 at 10.)

9   Assuming the various allocations described above are awarded in full, the net settlement amount

10   will be approximately $1,148,400.00.  (*Id*. at 14.)  The entire net settlement amount will be

11   distributed to the Class Members on a proportional and non-reversionary basis, with any

12   uncashed funds to be sent to the California Unclaimed Property Fund.  (*Id*. at 14–15.)

13          Plaintiffs estimate that the maximum potential damages as to their core claims are

14   approximately $16,015,288, with an additional $1,467,655 maximum in waiting time penalties

15   and a $6,882,400 maximum in PAGA penalties.  Of the potential maximum PAGA penalties, the

16   LWDA would receive 75% ($5,161,800), and the remaining 25% ($1,720,600) would be

17   available to Aggrieved Employees.  The maximum potential recovery for recipients here then is

18   approximately $19,203,543 ($16,015,288 + $1,467,655 + $1,720,600).  *See Cruz v. MM 879, Inc*.,

19   No. 1:15-cv-01563-TLN-EPG, 2025 WL 1684354, at *15 (E.D. Cal. June 16, 2025) (deducting

20   the LWDA's portion of estimated PAGA penalty from the projected recovery amount before

21   calculating the percentage rate of recovery).  Accordingly, the GSA of $2,000,000 represents

22   approximately 10.4% of plaintiffs' maximum potential recovery as to all of their claims, and the

23   net settlement amount of $1,148,400.00, which does not include the PAGA penalties payable to

24   the Aggrieved Employees, represents approximately 7.2% of plaintiffs' maximum potential

25   recovery for all their core claims.  This proportion is in the range of the percentage recoveries that

26   California district courts—including this one—have found to be reasonable.  *See, e.g.*, *Singh v.*

27   *Roadrunner Intermodal Servs., LLC*, No. 1:15-cv-01497-DAD-BAM, 2019 WL 316814, at *5

28   (E.D. Cal. Jan. 24, 2019*)* (holding that the "amount offered in settlement . . . weigh[ed] in favor

of final approval" where the net settlement amount of $5,868,517.01 accounted for almost 7.6% of the maximum damages available as to the plaintiffs' core claims); *Coppel v. SeaWorld Parks & Ent., Inc*., No. 21-cv-01430-RSH-DDL, 2025 WL 1346873, at *5 (S.D. Cal. May 8, 2025) (preliminarily approving a settlement where the GSA "equals approximately 11.5% of the maximum potential recovery"); *In re Splunk Inc. Sec. Litig*., No. 20-cv-08600-JST, 2024 WL 923777, at *6 (N.D. Cal. Mar. 4, 2024) (finding "the percentage of recovery fair and reasonable" where "the settlement represents between approximately 5% and 20.5% of the realistic maximum damages for the Settlement Class"); *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1042 (N.D. Cal. 2008) (approving a settlement where the GSA accounted for approximately 9% of the maximum potential recovery, and after accounting for attorneys' fees and costs, the net settlement gave plaintiffs about 6% of their maximum potential recovery). In addition, the recovery anticipated by the parties' proposed settlement would be allocated such that employees will receive payouts that scale directly with their number of weeks worked. (Doc. No. 39 at 14.)

Plaintiffs assert that the settlement amount is fair, adequate, and reasonable "[c]onsidering [d]efendant's defenses." (Doc. No. 39 at 30.) Despite remaining "confident in their position," plaintiffs acknowledge that a factfinder could side with defendant on a number of issues presented in this case, including whether instances in the time records of noncompliant meal periods is the result of "employee choice," whether certain employee actions had a business purpose, whether the employees knew to speak with their supervisor about any concerns with their wage statements and suffered no injury regarding those statements, and whether any of defendant's violations were willful for the purposes of waiting time penalties. (Doc. No. 39 at 22–28.) Further, as with all PAGA claims, penalties awarded are subject to discretionary reductions from the trial court. *See* Cal. Lab. Code § 2699(e)(2). Thus, plaintiffs' counsel contends that even if plaintiffs were successful at trial, there could be a substantial reduction in the maximum penalty amount of recovery. (Doc. No. 39 at 29.) Plaintiffs also note that, although they believe that the Ninth Circuit would affirm this court's order denying defendant's motion to compel arbitration, they had to take defendant's appeal of that order into consideration during settlement negotiations because of the risk that if the appeal were to be successful,

1   plaintiffs' claims would be compelled to arbitration and the Class would recover nothing.  (*Id.* at

2   11, 21.)

3          The court also observes that $1,786, the amount that the average putative Class Member

4   can expect to receive under the proposed settlement, is significant given plaintiffs' hourly pay rate

5   of $18.  (Doc. No. 41 at ¶ 134); *see Mondrian v. Trius Trucking, Inc.*, No. 1:19-cv-00884-DAD-

6   SKO, 2022 WL 2306963, at *15 (E.D. Cal. June 27, 2022) (noting that an average settlement

7   award of $1,239.00 is significant for employees who typically earn $25.16 per hour).

8          While "a larger award was theoretically possible, 'the very essence of a settlement is

9   compromise, a yielding of absolutes and an abandoning of highest hopes.'"  *Barbosa v. Cargill*

10  *Meat Sols. Corp.*, 297 F.R.D. 431, 447 (E.D. Cal. 2013) (citing *Linney v. Cellular Alaska P'ship*,

11  151 F.3d 1234, 1242 (9th Cir. 1998) (internal citations and quotation marks omitted)).  For all of

12  these reasons, the court will preliminarily approve the settlement amount reflected in the parties'

13  proposed settlement as being adequate.

14              b.    *PAGA Penalties*

15         The settlement also provides for $100,000.00 in civil PAGA penalties.  (Doc. No. 39-1 at

16  22.)  Pursuant to the PAGA before its recent amendment, 75% of the civil penalties, or

17  $75,000.00, will go to the LWDA, and 25%, or $25,000.00, will be included in the net settlement

18  amount and payable to Aggrieved Employees.  (*Id.*)  *See* Cal. Lab. Code § 2699(i) (2016)

19  (requiring a 75%-25% apportionment); *id.* § 2699(m), (v)(1) (2024) (noting that the 2024

20  amendments, including the new 65%-35% apportionment requirement, apply only to "civil

21  action[s] brought on or after June 19, 2024").

22         As noted above, plaintiffs' counsel calculated plaintiffs' potential damages under

23  plaintiffs' PAGA claim to be $6,882,400.  (Doc. No. 39-1 at 14.)  However, plaintiffs' counsel

24  asserts that they "recognize and reasonably believe the Court could significantly reduce any

25  PAGA penalties if Defendant was found liable for the underlying Labor Code violations," and

26  they note that their PAGA claims are subject to "the same risks on the merits" as their core

27  claims.  (*Id.* at 14–15.)

28  /////

The resulting $100,000.00 allocated towards civil penalties represents 5% of the $2,000,000.00 GSA.  The amount proposed to settle plaintiffs' PAGA claims is consistent with other PAGA settlements approved by this court.  *See Syed v. M-I, LLC*, No. 1:12-cv-01718-DAD-MJS, 2017 WL 714367, at *13 (E.D. Cal. Feb. 22, 2017) (approving $100,000.00 in PAGA penalties for a California class with a $3,950,000.00 GSA); *see also Diaz v. United Parcel Serv., Inc.*, No. 1:22-cv-00246-CDB, 2023 WL 8622325, at *9 (E.D. Cal. Dec. 13, 2023) (holding that "the amount offered in the settlement of the PAGA claims weighs in favor of granting final approval" where the PAGA penalty represented 5% of the GSA).  The court therefore preliminarily concludes that the settlement of plaintiffs' PAGA claims is fair, reasonable, and adequate in light of the PAGA's public policy goals.  *See O'Connor*, 201 F. Supp. 3d at 1133.

          c.     *Attorneys' Fees*

When a negotiated class action settlement includes an award of attorneys' fees, the district court "ha[s] an independent obligation to ensure that the award, like the settlement itself, is reasonable, even if the parties have already agreed to an amount." *Bluetooth*, 654 F.3d at 941; *see also Knisley v. Network Assocs., Inc.*, 312 F.3d 1123, 1125 (9th Cir. 2002) (citation omitted). Where, as here, fees are to be paid from a common fund, the relationship between the class members and class counsel "turns adversarial." *In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988, 994 (9th Cir. 2010) (citation omitted).  As a result, the district court must assume a fiduciary role for the class members and "act with a jealous regard to the rights of those who are interested in the fund in determining what a proper fee award is." *Id.* (internal quotation marks and citations omitted).

In evaluating the award of attorneys' fees, "courts have discretion to employ either the lodestar method or the percentage-of-recovery method." *Bluetooth*, 654 F.3d at 942 (citations omitted).  Under either approach, "[r]easonableness is the goal, and mechanical or formulaic application of either method, where it yields an unreasonable result, can be an abuse of discretion." *Fischel v. Equitable Life Assurance Soc'y of U.S.*, 307 F.3d 997, 1007 (9th Cir. 2002).

/////

23

1    Under the percentage of the fund method, the court may award class counsel a percentage

2    of the common fund recovered for the class; in the Ninth Circuit, the benchmark as to such fees is

3    25%. *Id.*; *see also Bluetooth*, 654 F.3d at 942; *Norton v. Strategic Staffing Sols., L.C.*, No. 3:23-

4    cv-06648-JSC, 2025 WL 1666143, at *8 (N.D. Cal. June 12, 2025) ("The Ninth Circuit uses a 25

5    percent of the fund 'benchmark' for awarding fees.").  Special circumstances that could justify

6    varying the benchmark award include when counsel achieves exceptional results for the class,

7    undertakes extremely risky litigation, generates benefits for the class beyond simply the cash

8    settlement fund, or handles the case on a contingency basis. *See In re Online DVD-Rental*

9    *Antitrust Litig.*, 779 F.3d 934, 954–55 (9th Cir. 2015).  An explanation is necessary when the

10    court departs from the 25% benchmark, *Powers v. Eichen*, 229 F.3d 1249, 1256–57 (9th Cir.

11    2000), but either way, "[s]election of the benchmark or any other rate must be supported by

12    findings that take into account all of the circumstances of the case." *Vizcaino v. Microsoft Corp.*,

13    290 F.3d 1043, 1048 (9th Cir. 2002).

14    Under the lodestar method, the court multiples the number of hours the prevailing party

15    reasonably spent litigating the case by a reasonable hourly rate for counsel. *Bluetooth*, 654 F.3d

16    at 941.  The product of this computation, the "lodestar" amount, yields a presumptively

17    reasonable fee. *See Gonzalez v. City of Maywood*, 729 F.3d 1196, 1202 (9th Cir. 2013).

18    The Ninth Circuit has recommended that district courts apply one method but then cross-

19    check the appropriateness of the determined amount by employing the other as well. *See*

20    *Bluetooth*, 654 F.3d at 944.  This diligence is particularly important when "counting *all* hours

21    expended," in a case "where the plaintiff has achieved only limited success," would yield an

22    "excessive amount" of fees, or when awarding a percentage of a "megafund would yield windfall

23    profits for class counsel in light of the hours spent on the case." *Id.* at 942; *see also id.* at 945

24    ("Just as the lodestar method can confirm that a percentage of recovery amount does not award

25    counsel an exorbitant hourly rate, the percentage-of-recovery method can likewise be used to

26    assure that counsel's fee does not dwarf class recovery.") (internal quotation marks and citations

27    omitted).  Similarly, an upward adjustment may be justified if the recovery is "too small . . . in

28    /////

light of the hours devoted to the case or other relevant factors." *Six (6) Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990).

Here, the settlement provides that Class counsel will seek an award of $666,600, equivalent to 33.33% of the GSA. (Doc. No. 39 at 11.) That amount is higher than the 25% benchmark established in the Ninth Circuit, *Bluetooth*, 654 F.3d at 942, but certainly not an uncommon percentage for wage and hour class actions litigated in the Eastern District of California. *See Barbosa*, 297 F.R.D. at 450 (listing cases where courts approved attorneys' fees of approximately one-third of the total settlement). The proposed Settlement Agreement also provides for an additional award of $50,000.00, which plaintiffs explain are the "costs incurred during the litigation of this case." (Doc. No. 39 at 13.)

In explaining their proposed departure from the 25% benchmark, plaintiffs' counsel state that it was through their "skill and effort that they were able to show why Defendant's motion to compel arbitration should be denied," and that without their "extensive research into the issues relevant to this motion" and "compelling arguments against Defendant's motion, this case easily could have . . . be[en] compelled to arbitration and the Class would recover nothing." (*Id*. at 11–12.) They argue that this was a "highly contested matter which required a significant amount of time and labor," and accordingly the "requested fee constitutes fair compensation for undertaking complex, risky, expensive, and time-consuming litigation on a contingent basis." (*Id*. at 12.) Considering the significant relief obtained for Class Members, and the contested issues regarding the arbitration provisions at issue in this case, the court accepts a measured departure from the benchmark percentage at this preliminary approval stage of the litigation. At the final approval stage, however, the court will carefully re-examine the award of attorneys' fees and conduct a final lodestar cross-check. At that point, the court will expect plaintiffs' counsel to provide the requisite billing records and calculations for cross check purposes and in justifying the fees they seek.[5] *See Fischel*, 307 F.3d at 1006–08 (noting that a district court has discretion to adjust a

---

[5] "Though the court may well grant an award of that size under certain circumstances, the court cannot abdicate its obligation to protect the rights of absent members by simply defaulting to the method [of determining attorneys' fees] proffered by plaintiffs." *Perez v. All Ag, Inc.*, No. 1:18-cv-00927-DAD-EPG, 2020 WL 1904825, at *9 (E.D. Cal. Apr. 17, 2020).

lodestar upward or downward, including by way of a multiplier, based on certain reasonableness factors); *Bluetooth*, 654 F.3d at 941–42 (same).  Additionally, plaintiffs' counsel must provide an accounting or invoices documenting the requested $50,000.00 in litigation expenses at the final approval stage, as they have indicated they will do.  (Doc. No. 39 at 13) ("Subject to Court approval, Plaintiffs' Counsel shall request a reimbursement from the GSA for actual litigation costs in an amount not to exceed $50,000.  These will be tabulated and presented to the Court at final approval.").

        d.     *Incentive Payment*

      While incentive awards are "fairly typical in class action cases," they are discretionary sums awarded by the court "to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 958–59 (9th Cir. 2009); *see also Staton v. Boeing Co.*, 327 F.3d 938, 977 (9th Cir. 2003) ("[N]amed plaintiffs . . . are eligible for reasonable incentive payments."). Such payments are to be evaluated individually, and the court should look to factors such as "the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions . . . the amount of time and effort the plaintiff expended in pursuing the litigation . . . and reasonabl[e] fear[s of] workplace retaliation." *Staton*, 327 F.3d at 977 (citation omitted).

      The two named plaintiffs in this action have requested incentive payments of $10,000.00 each.  (Doc. No. 39-1 at 19.)  According to the declaration of plaintiff Munoz, he has "diligently worked on this case," has "had many meetings and conversations with [his] attorneys about [his] experience working for RDO," and "regularly talked with [his] attorneys . . . [o]n many occasions."  (Doc. No. 39-3 at ¶¶ 6, 7.)  Plaintiff Munoz avers that he has "spent numerous hours on this case," including "search[ing] for and provid[ing] [his] attorneys with documents [he] received from RDO, such as policy documents [he] received during [his] employment."  (*Id*. at ¶ 8.)  Plaintiff Munoz also states that he "completely and carefully reviewed the memorandum of understanding and the settlement agreement" before signing.  (*Id*. at ¶ 10.)  Plaintiff Blanco

declares that he spent 1.5 hours researching "the leading class action and employment law firms in California" and then spent over 40 hours "meeting with [his] attorneys concerning the case and performing [his] responsibilities as a class representative," including gathering employment documents, reviewing documents, providing contact information, speaking with other employees of defendant, providing guidance regarding the duties and responsibilities of other employees to help determine commonality and typicality, discussing his employment experience and the work environment, reviewing the operative complaint and Settlement Agreement, reviewing written notices sent to the LWDA, and reviewing discovery requests.  (Doc. No. 39-4 at ¶¶ 4, 5.) Plaintiff Blanco also states that he is aware that he "might have difficulty finding employment in the future compared to candidates who have not been a part of class action," and that "[s]erving as a class representative is not something [he] took lightly" particularly given the risk of this action being unsuccessful and "a judgment of attorneys' fees and costs entered against [him]." (*Id*. at ¶¶ 10, 12.)

　　　　As noted, under the proposed settlement, the average putative Class Member will receive $1,786.00.  (Doc. No. 36 at 12.)  Thus, proposed incentive awards of $10,000 are roughly 5.6 times the average amount each putative Class Member could expect to receive from the proposed settlement.  Though this figure is not necessarily excessive, *see, e.g.*, *Aguilar v. Wawona Frozen Foods*, No. 1:15-cv-00093-DAD-EPG, 2017 WL 2214936, at *8 (E.D. Cal. May 19, 2017) (approving an incentive award of $7,500 to each class representative where average class recovery was approximately $500), the Ninth Circuit has repeatedly urged district courts to be "vigilant in scrutinizing all incentive awards to determine whether they destroy the adequacy of the class representatives."  *Radcliffe v. Experian Info. Sols. Inc.*, 715 F.3d 1157, 1163 (9th Cir. 2013) (citation omitted); *see also In re Online DVD-Rental Antitrust Litig.*, 779 F.3d at 941–43 (upholding district court's determination that awarding $5,000 each to nine class representatives was appropriate even though objectors argued it was significantly larger than the $12 each unnamed class member would receive).

　　　　Having reviewed the proposed $10,000.00 incentive awards for the named plaintiffs, the court notes that the amount requested may be disproportionate given the possible disparity with

1  the settlement's average or median award. However, in recognition of the initiative demonstrated

2  by the named plaintiffs, the court will preliminarily approve the proposed incentive awards on the

3  condition that plaintiffs demonstrate at the final approval stage that the requested awards are

4  commensurate with and do not dwarf the average or median award to be received by the Class

5  Members.[6]

6          e.     *Release of Claims*

7          All Class Members who do not timely opt-out of the settlement are Participating Class

8  Members who will be deemed to have released defendant from the Released Claims. (Doc. No.

9  39-1 at 22–23.) The Released Claims appropriately track plaintiffs' claims in this action and the

10  settlement does not appear to release unrelated claims that Class Members may have against

11  defendant. According to the Settlement Agreement, each Aggrieved Employee shall also fully

12  release defendant from the Released PAGA Claims. (*Id*. at 23.) While not clearly stated, the

13  court infers from this that the parties intend for all Aggrieved Employees to be subject to the

14  release of the Released PAGA Claims, whether or not they opt-out of the Class. *See Sakkab v.*

15  *Luxottica Retail North Am., Inc*., 803 F.3d 425, 436 n.10 (9th Cir. 2015) ("A judgment in a

16  PAGA action binds absent employees because it binds the government agency tasked with

17  enforcing the labor laws."); *O'Connor*, 201 F. Supp. 3d at 1134 (noting that fellow aggrieved

18  workers are "effectively bound by any judgment" and that "PAGA does not require class action

19  procedures, such as notice and opt-out rights"). Therefore, the court will preliminarily approve

20  the release of claims provision, but the parties are directed to more clearly state their intentions as

21  to the Released PAGA Claims along with any additional authority supporting the scope of that

22  release in their motion for final approval.

23  **C.     Proposed Class Notice and Administration**

24          For proposed settlements under Rule 23, "the court must direct notice in a reasonable

25  manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1); *see*

26

---

27  [6] Plaintiffs have provided the court with the average award expected from the settlement but have
not provided the court with estimates regarding the expected median, minimum, or maximum
28  awards. Plaintiffs are directed to provide this information in their motion for final approval.

*also Hanlon*, 150 F.3d at 1025 ("Adequate notice is critical to court approval of a class settlement under Rule 23(e)."). For a class certified under Federal Rule of Civil Procedure 23(b)(3), the notice must contain, in plain and clear language: (1) the nature of the action; (2) the definition of the class certified; (3) the class claims, issues, or defenses; (4) the right of a class member to appear through an attorney, if desired; (5) the right to be excluded from the settlement; (6) the time and manner for requesting an exclusion; and (7) the binding effect of a class judgment on members of the class. Fed. R. Civ. P. 23(c)(2)(B). A class action settlement notice "is satisfactory if it generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard." *Churchill Vill., LLC v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004) (internal quotation marks and citations omitted).

Here, the Settlement Agreement provides that within ten days of the date of entry of this order, defendant "shall deliver to the Settlement Administrator an electronic database, which will list the Class and PAGA Data." (Doc. No. 39-1 at 31.) "The Class Data and PAGA Data shall be based on Defendant's payroll, personnel, and other business records." (*Id.* at 31–32.) Based on the information in the Class and PAGA Data, the Settlement Administrator will calculate the estimated individual settlement share and individual PAGA settlement share for every Class Member and Aggrieved Employee, to be included in individualized Class Notices to be sent to that Class Member and/or Aggrieved Employee. (*Id.* at 32.) Within ten days of defendant providing the data, the Settlement Administrator will send Class Notices to all Class Members via first-class mail. (*Id.*) If a Class Notice is returned because of an incorrect address, within five days from receipt of the returned notice, the Settlement Administrator will conduct a search for a more current address for the Class Member and re-mail the Class Notice to the Class Member. (*Id.*) The Settlement Administrator will use the National Change of Address Database and skip traces to attempt to identify the member's current address, and will take steps including, at a minimum, tracking all undelivered mail; performing address searches for all mail returned without a forwarding address; and promptly re-mailing notices when new addresses are found. (*Id.* at 32–33.) On a weekly basis, the Settlement Administrator must send Class counsel and defendant's counsel updates showing any returned and re-mailed notices and any received notices

from Class Members requesting to be excluded from the settlement or objecting to the settlement. (*Id.* at 33.)  No later than fourteen days after the response deadline, which is thirty days from the initial mailing of the Class Notices, the Settlement Administrator will serve on all parties and file with this court a declaration of its due diligence setting forth its compliance with these terms of the Settlement Agreement.  (*Id.* at 23, 33.)

A review of the Class Notice confirms it provides adequate information regarding the nature of the litigation, the essential terms of the settlement, how a Class Member would object to the settlement, and how a Class Member would request to be excluded from the settlement.  (Doc. No. 39-1 at 47–56.)  The Class Notice also identifies the Class counsel; specifies the amounts that will be sought for the named plaintiffs' incentive payments and Class counsel's fees and expenses; and explains how to obtain additional information, including a blank for a link to a website.  (*Id.* at 50–51, 55.)  The Class Notice also adequately informs the Class Members of the scope of the Released Claims.  (*Id.* at 52.)  The Class Notice does not reference or describe the "Option to Terminate" section of the Settlement Agreement, under which defendant retains the right to void the settlement if more than 10% of the Class Members opt-out of the settlement.[7] (Doc. No. 39-1 at 35.)

The court finds that the notice and the manner of notice proposed by plaintiffs meet the requirements of Federal Civil Procedure Rule 23(c)(2)(B) and 29 U.S.C. § 216(b) and that the proposed mail delivery is appropriate under these circumstances.

/////

---

[7] The parties have not provided any authority that would support a finding that this provision— and the 10% threshold—is reasonable, fair, and adequate under Rule 23.  However, the court has located authority for the proposition that such provisions generally aid in encouraging settlement by limiting liability for defendants and providing leverage for plaintiffs.  *See Medina v. NYC Harlem Foods Inc.*, No. 1:21-cv-01321-VSB, 2022 WL 1184260, at *6 (S.D.N.Y. Apr. 21, 2022). Accordingly, the court preliminarily deems the provision proposed as part of the settlement here to be reasonable, fair, and adequate subject to review at the final approval hearing.  *See Swain v. Anders Grp., LLC*, No. 1:21-cv-00197-SKO, 2022 WL 5250139, at *15 n.11 (E.D. Cal. Oct. 6, 2022) (preliminarily deeming a 10% blow up provision reasonable, fair, and adequate); *Dynabursky v. Alliedbarton Security Services, LP*, No. 8:12-cv-02210-JLS-RNB, 2016 WL 8921915, at *13, *2 n.1 (C.D. Cal. Aug. 15, 2016) (granting preliminary approval of a settlement agreement involving a blow up clause with a 10% opt-out threshold).

**D.    Settlement Administrator and Settlement Administration Costs**

The parties have agreed to retain Phoenix to handle the notice and claim administration process and request that Phoenix be appointed to serve as the Settlement Administrator.  (Doc. No. 39 at 13.)

The estimated cost of administering this settlement is "not to exceed $15,000," which will be deducted from the GSA.  (*Id.*)  This estimate is reasonable when compared with administration fees proposed in other settlements submitted to this court.  *See, e.g.*, *Mondrian*, 2022 WL 2306963, at *21 (administration costs of "less than $15,000" for a $995,000 settlement); *Castro*, 2020 WL 1984240, at *19 (administration costs of $15,000 for a $3.75 million settlement); *Gonzalez v. CoreCivic of Tennessee, LLC*, No. 1:16-cv-01891-DAD-JLT, 2020 WL 1475991, at *14 (E.D. Cal. Mar. 26, 2020) (administration costs of $15,000 for a $3.2 million settlement); *Dakota Med., Inc. v. RehabCare Grp., Inc.,* No. 1:14-cv-02081-DAD-BAM, 2017 WL 1398816, at *5 (E.D. Cal. Apr. 19, 2017) (administration costs of $94,000 for a $25 million settlement); *Aguilar v. Wawona Frozen Foods*, No. 1:15-cv-00093-DAD-EPG, 2017 WL 117789, at *7 (E.D. Cal. Jan. 11, 2017) (administration costs of $45,000 for a $4.5 million settlement).

The court will appoint Phoenix as the Settlement Administrator.

**E.    Implementation Schedule**

The court sets the following implementation schedule, which is based on timelines set out in the Settlement Agreement:

| Event | Date |
|---|---|
| Deadline for defendant to provide Phoenix with a spreadsheet containing Class Member contact information and data necessary to calculate settlement shares | No later than 10 days after entry of this order granting preliminary approval |
| Deadline for Phoenix to mail Class Notices to all Class Members | No later than 10 days after Phoenix receives Class Member contact information and settlement share data from defendant |
| Deadline for Class Members to challenge weeks worked information | No later than 30 days after Phoenix mails the Class Notices to all Class Members |

31

| Deadline for Class Members to file with the court and send to Phoenix any objections regarding the settlement | No later than 30 days after Phoenix mails the Class Notices to all Class Members |
|---|---|
| Deadline for Class Members to request exclusion from the settlement | No later than 30 days after Phoenix mails the Class Notices to all Class Members |
| Deadline to compile and submit to the parties a list of all Class Members who submitted timely and valid requests for exclusion, objections, or disputed the number of pay periods worked from the settlement | No later than 5 days after the deadline for Class Members to submit a request for exclusion |
| Deadline for plaintiffs to file a motion for final approval | No later than 35 days before the final approval hearing |
| Final Approval Hearing | November 17, 2025 at 1:30 p.m. |
| Deadline for defendant to deposit settlement amount with Settlement Administrator | No later than 7 days after the date the Final Approval Order becomes final ("Effective Date") |
| Deadline for Settlement Administrator to issue checks to Class Members and Aggrieved Employees | No later than 10 days after receipt of the Gross Settlement Amount |
| Deadline for recipients to cash settlement checks | One hundred eighty days (180) from the date it is issued or re-issued (if the initial check is returned as a result of an incorrect address) |

In addition to the dates identified in this implementation schedule, the parties and Phoenix are instructed to follow the remaining dates and time restrictions identified in the Settlement Agreement (*See* Doc. No. 39-1 at 17–45).

## CONCLUSION

For the reasons explained above:

1.    Plaintiffs' motion for preliminary approval of class action settlement (Doc. No. 39) is GRANTED;

2.    The proposed Class identified in the Settlement Agreement (Doc. No. 39-1) is CERTIFIED for settlement purposes;

/////

/////

32

3.  Plaintiffs' counsel, David Thomas Mara and Jill Marie Vecchi of Mara Law Firm, PC, and Douglas Han, Shunt Tatavos-Gharajeh, and William Wilkinson of Justice Law Corporation, are APPOINTED as Class counsel for settlement purposes;

4.  The named plaintiffs Simon Munoz and Giancarlo Bianco are APPOINTED as Class representatives for settlement purposes;

5.  Phoenix Class Action Administration Solutions is APPROVED as the Settlement Administrator;

6.  The proposed Class Notice (Doc. No. 39-1 at 47–56) is APPROVED in accordance with Federal Rule of Civil Procedure 23;

7.  Before sending out the Class Notice, the court DIRECTS the parties or Phoenix to fill in all blank or bracketed placeholders in the Class Notice with the appropriate information;

8.  The proposed settlement detailed herein is APPROVED on a preliminary basis as fair and adequate;

9.  The hearing for final approval of the proposed settlement is SET for Monday, November 17, 2025 at 1:30 p.m. before the undersigned in Courtroom 4, with the motion for final approval of class action settlement to be filed at least 35 days in advance of the final approval hearing, in accordance with Local Rule 230(b); and

10. The settlement implementation schedule set forth above is ADOPTED.

IT IS SO ORDERED.

Dated:  __July 30, 2025__                          _Dale A. Drozd_
                                                DALE A. DROZD
                                                UNITED STATES DISTRICT JUDGE

33